UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re                                                                                       Chapter 7
Thomas R. Rowell and                                                      Case No. 14-25460-svk
Natasha Rowell,
                    Debtors.

# MEMORANDUM DECISION

Bankruptcy Code § 707(b)(2)(D) exempts certain veterans from undergoing "any form of means testing" when attempting to qualify for Chapter 7 relief. The wealthy debtors in this case argue that they qualify for a Chapter 7 discharge under this exemption. Thomas and Natasha Rowell (the "Debtors") filed a Chapter 7 petition on April 30, 2014. Thomas is a psychiatrist and a reservist in the United States Army who was called to active duty on July 31, 2012, and released from active duty in November 2012. The Debtors filed their bankruptcy petition during the 540-day period following his release from active duty.

On September 15, 2014, the U.S. Trustee filed a motion to dismiss the Debtors' case under Bankruptcy Code § 707(b). (ECF No. 27.) The U.S. Trustee argued that the means test applied to the Debtors' case, and that even if it did not, that their case should be dismissed as an abuse under the totality of the circumstances. The Debtors disputed both claims. With the agreement of the parties, the Court bifurcated the issues. In a Decision issued on January 8, 2015, the Court determined that because the 540-day period after Thomas' release from active duty had not expired when the Debtors filed their petition, the means test did not apply. (ECF No. 38.)

The parties then stipulated to the facts relevant to the U.S. Trustee's "totality of the circumstances" argument. (ECF No. 45, hereinafter, "Stip."). This Memorandum Decision constitutes the Court's findings of fact and conclusions of law on that issue.

## I. Statement of Facts

The Debtors are both highly educated. Thomas is a licensed psychiatrist, and Natasha has a master's degree in education and psychology. (Stip. ¶¶ 14, 21.) After almost ten years of marriage and the birth of one child, the Debtors filed for divorce in 2011. (Stip. ¶¶ 9, 10.) The divorce was granted on May 23, 2014 and finalized in December 2014. (Stip. ¶¶ 9, 59.)

Prior to the petition, Thomas lived and practiced psychiatry in Virginia. (Stip. ¶¶ 22, 23, 25.) He had an independent private practice and operated a separate practice as part of an employment agreement with Danville Regional Medical Center ("Danville"). (Stip. ¶¶ 23, 25.) In 2009, while running both practices, Thomas received orders to deploy to Kosovo for 90 days. (Stip. ¶ 30.) While deployed, his practice suffered. (Stip. ¶ 32.) When he returned from his deployment, Thomas could not find a way to maintain the Danville practice in the event he was deployed again, and Thomas severed his employment contract with Danville. (Stip. ¶ 35.) Thomas and Danville then entered into arbitration over the breached employment contract, resulting in an award of $182,464 plus interest in Danville's favor. (Stip. ¶ 37.) Thomas was deployed again on July 31, 2012 and released from active duty on November 24, 2012. (Stip. ¶ 38.) The Debtors filed their Chapter 7 bankruptcy petition on April 30, 2014. (ECF No. 1.)

At the time of filing, the Debtors listed $467,717 of secured debt on Schedule D. (Stip. ¶ 40.) The debt includes three mortgages on their former home in Virginia totaling approximately $273,000 and secured liens of approximately $69,000 and $37,000 on two vacant lots. (*Id*.) The Debtors' unsecured debt on Schedule F totals $520,415. (Stip. ¶ 42.) It consists of $223,933 in

student loan debt, $200,000 for the Danville arbitration award, $71,482 in credit card debt, loans and cable/phone charges, and $25,000 for a medical software lease. (*Id.*) The Debtors' exempt retirement assets total $100,614, and they have no non-exempt assets. (Stip. ¶¶ 43, 44.)

Both of the Debtors are gainfully employed. (Stip. ¶¶ 46-48.) In 2012 the Debtors earned $443,332 of combined income, and in 2013 they earned $557,400 of combined income. (Stip. ¶ 51.) Their annual gross income as of the date of the petition was $591,867. (Stip. ¶¶ 49, 50.) Because they maintain separate households, they filed two expense schedules. (Stip. ¶ 52.) Thomas claimed $12,098 of monthly expenses for a household of two,[1] including: rent of $2,200; home maintenance of $300; food and housekeeping supplies of $800; clothing, laundry and dry cleaning of $300; personal care products and services of $200; entertainment expenses of $1,000; two vehicle payments totaling $1,250; back tax payments of $800; and divorce attorney fees of $3,000. (Stip. ¶ 53.)

Natasha's expenses for a household of two total $13,901 a month, including: rent of $1,050; food and housekeeping supplies of $1,000; childcare and education costs of $1,500; clothing, laundry and dry cleaning costs of $750; entertainment costs of $1,430, including a monthly stay at a waterpark and the cost of trips to South Africa; back tax payments of $200; a vehicle payment of $640; student loan payments of $1,497; mortgage payments totaling $1,152 for properties in Virginia; pet and hobby costs of $300; incidental costs of $500; and divorce attorney fees of $2,500. (Stip. ¶¶ 54, 57.)

The Debtors concede that they have the ability to pay a significant amount to their creditors in future monthly payments. (Stip. ¶ 60.) After deducting the expenses for the two

---

[1] Both Debtors claim their son as part of their household on their schedules.

households, the Debtors report a $3,732 surplus per month. (Stip. ¶ 55.) In addition to the surplus, the Debtors no longer incur two major expenses listed on the schedules. Natasha no longer pays $1,152 in mortgage payments on the vacant lots since the bank foreclosed on the properties. (Stip. ¶ 56.) Second, the Debtors no longer spend a combined $5,500 in monthly divorce attorneys' fees, as the divorce was finalized in 2014. (Stip. ¶ 59.)

## II. Analysis

A court can dismiss a Chapter 7 case under § 707(b)(3) if the totality of a debtor's financial circumstances demonstrates abuse. 11 U.S.C. § 707(b)(3)(B). The Debtors argue that since they are exempt from "any form of means testing" under The National Guard and Reservist Debt Relief Act of 2008, Pub. L. No. 110-438, 122 Stat. 5000 (2008) (the "Act"), this Court cannot consider their ability to pay their debts as part of the totality of the circumstances analysis. Alternatively, the Debtors argue their case is not an abusive under the totality of the circumstances because the U.S. Trustee has not demonstrated "any facts that would show the [Debtors'] filing was an abuse of the bankruptcy system, other than the ability to pay." (ECF No. 62 at 12.) The U.S. Trustee disagrees and contends that the Act does not prohibit the Court from considering the Debtors' ability to pay under § 707(b)(3) and that the totality of the Debtors' financial circumstances demonstrates abuse.[2]

### A. "Any form of means testing" is a reference to the means test in § 707(b)(2).

The Act, codified in Bankruptcy Code § 707(b)(2)(D), states that for certain veterans: "Subparagraphs (A) through (C) shall not apply, and the court may not dismiss or convert a case based on any form of means testing." 11 U.S.C. § 707(b)(2)(D)(i). Subparagraphs (A) through

---

[2] One court has previously considered this question and sided with the U.S. Trustee. In *In re Green*, 431 B.R. 187 (Bankr. S.D. Ohio 2010), the bankruptcy court held that "any form of means testing" refers to the "means test" created by BAPCPA. Since that decision, no court has questioned or criticized the analysis.

4

(C) contain the presumption of abuse calculations added by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), commonly known as the "means test." By referring to the means test and "any form of means testing" does the Statute preclude consideration of an ability to pay under the totality of circumstances test of § 707(b)(3)?

As this Court noted in its prior Decision in this case, "To resolve a dispute over the meaning of a statute, the court begins with the language of the statute itself. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). Where the language is plain, the court should enforce it according to its terms. *Id.* However, where that meaning is ambiguous or leads to a senseless result, the Court should examine the text with the goal of uncovering the legislative purpose behind the words. *Lamie v. United States Tr.,* 540 U.S. 526, 534 (2004). Whether a statute is ambiguous should be determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). The language of a statute is ambiguous if it is susceptible to more than one reasonable interpretation or more than one accepted meaning. *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 519 (5th Cir. 2004).

Here, the statute says that certain veterans are not subject to the calculations of § 707(b)(2)(A) through (C), and the court may not dismiss a case "based on any form of means testing." "Any form of means testing" is not defined in the Bankruptcy Code, but the word "any" suggests that more than the means test itself should be included in the sweep of the statute. One definition of "any" is "every". *See http://www.merriam-webster.com/dictionary.* Under this interpretation, certain veterans are exempt from every form of means testing, whether or not codified in § 707(b)(2). On the other hand, "means test" is a term of art under BAPCPA, and "any form of means testing" could simply be referring back to the cited provisions of the statute.

5

*See In re Green, supra*. Both of these interpretations are reasonable, and the Court concludes that "any form of means testing" in § 707(b)(2)(D) is ambiguous.

"When a statute is ambiguous, the court may seek guidance in the statutory structure, relevant legislative history, congressional purposes expressed in the pertinent act, and general principles of law applicable to the circumstances of the statute to determine the appropriate interpretation." *In re Knudsen*, 389 B.R. 643, 653 (N.D. Iowa 2008) (citing *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001); *United States v. White Plume*, 447 F.3d 1067, 1074 (8th Cir. 2006)). This statute's structure features the ambiguous phrase in § 707(b)(2)(D), immediately following the means test of § 707(b)(2)(A) through (C). The inclusion of the disputed language within the means test provision, rather than as a stand-alone provision or as part of § 707(b)(3), supports the U.S. Trustee's position that the prohibited means testing is that spelled out in § 707(b)(2)(A) through (C). And the legislative history clearly confirms that Congress only intended "any form of means testing" to refer back to the means test calculations of those subsections.

Congress' intent to limit "any form of means testing" to the provisions of § 707(b)(2)(A) through (C) is evident from the inception of the Act. The purpose of the bill, as introduced in the House of Representatives, was "to exempt from the means test in bankruptcy cases, for a limited period, qualifying reserve component members. . ." 154 Cong. Rec. H5801-07 (daily ed. June 23, 2008) (statement of Rep. Daniel Lundgren). In sponsoring an extension of the Act in 2011, Representative Steve Cohen echoed the same objective: "The National Guard and Reservist Debt Relief Act of 2008 created an exception to the means test's presumption for members of the National Guard and Reserves." 157 Cong. Rec. H7906 (daily ed. Nov. 29, 2011) (statement of Rep. Steve Cohen). Importantly, when the Act was extended in 2011, Representative Cohen's

6

remarks were repeated in the stated purpose of the extension: "to exempt [qualified veterans] for an additional 4-year period, from <u>the application of the means-test presumption of abuse</u> under chapter 7." National Guard and Reservist Debt Relief Extension Act of 2011, Pub. L. No. 112-64, 125 Stat. 766, 766 (2011) (emphasis added). The presumption of abuse calculations are contained in § 707(b)(2)(A) through (C), demonstrating that "any form of means testing" refers to that means test.

This interpretation carries through in a Congressional mandate included in the Act to prevent abuse of the exemption. The Act's bipartisan support depended on the inclusion of a provision to "be sure of whether reservists and guardsmen are using the relief granted by the bill when it is their service that lead to bankruptcy." 154 Cong. Rec. H5801-07 (daily ed. June 23, 2008) (statement of Rep. Daniel Lundgren). Section 3 of the Act requires the United States Government Accountability Office (GAO) to provide information on the use and effects of the provisions of the Act to determine whether there were any indications of abuse or potential misuse of the exemption. In its report, the GAO summarized, "The [Act] exempts qualifying members of the National Guard and Reserve Components from the means test process when they file a petition for Chapter 7 bankruptcy relief." U.S. Gen. Accounting Office, GAO-10-1014R, *Military Personnel: Observations on the Use and Effects of the National Guard and Reservists Debt Relief Act of 2008* (2010).

The legislative history reveals that Congress was concerned about the vast fluctuations in pay that can occur when a person is called to active duty. Congress did not want these fluctuations to cause service members potentially to fail the means test when in reality the service member was financially distressed as a result of military service. Senator Durbin, the bill's principal sponsor in the Senate, explained one possible scenario:

7

> My bill would exempt returning Guard and Reserve members from this means test, both because our finest men and women deserve greater financial protection and because they are uniquely disadvantaged by the means test criteria. Despite receiving much-deserved active duty pay for their service, National Guard and Reserve members often take a pay cut when they leave their jobs for a deployment. But because the means test includes the past 6 months of income in its calculation, men and women with little current income may not qualify for bankruptcy protection.

154 Cong. Rec. S6166 (daily ed. June 25, 2008) (statement of Sen. Durbin).

Similarly, House bill co-sponsor Rep. Jackson-Lee explained:

> This bill makes sense because often Armed Services personnel and Reservists receive high compensation when they are away on hazardous tours or combat zones. However, when these individuals return, their income is not as high. Therefore, it is unfair to subject these individuals to the means test. Simply, the means test is whether the person has the means to pay his or her debts. Hazard pay and temporary high pay for combat work is not necessarily a good indicator of a person's means or ability to pay. These individuals are serving our country and have legitimate financial concerns. I do not believe that they should be penalized.

154 Cong. Rec. H5801-07 (daily ed. June 23, 2008) (statement of Rep. Jackson-Lee).

These statements unequivocally show that Congress intended to provide returning service members an exemption from the means test because their income can drop when returning from active duty. In its report recommending the bill, the House Judiciary Committee summarized: "This bipartisan legislation responds to the fact that some who serve in the National Guard and Reserves encounter financial difficulties during or in the wake of their service and that they merit relief from the additional proof requirements of the means test." H.R. Rep. No. 110-726, at 3 (2008). The Court concludes that the clear Congressional intent in creating and extending the Act was to protect veterans from the means test presumption of abuse.

The Debtors argue that the exemption must extend beyond the presumption of abuse calculations because otherwise the exemption would amount to a nullity. The Debtors state that their use of the exemption amounts to legitimate pre-bankruptcy planning and that "[t]here

8

would be no purpose in Congress granting a right to veterans, if the veterans didn't need it and would not be allowed to use it." (ECF No. 62 at 7.) The Debtors' argument ignores the presumptions created by BAPCPA and the advantage that exemption from the means test provides. If the Debtors "fail" the means test, the burden is on them to demonstrate special circumstances, such as a serious medical condition, to justify additional expenses or adjustments to current monthly income. 11 U.S.C. § 707(b)(2)(B)(i). By exempting them from the means test, Congress shifted the burden of proof to the U.S. Trustee to demonstrate that the Debtors filed their petition in bad faith or that the totality of the circumstances of the Debtors' financial situation demonstrates abuse. *See Ross-Tousey v. Neary (In re Ross-Tousey)*, 549 F.3d 1148, 1161-62 (7th Cir. 2008) *abrogated on other grounds*, *Ransom v. FIA Card Services, N.A. (In re Ranson)*, 562 U.S. 61, 68 (2011). Moreover, the exemption recognizes that the six months of income prior to the petition may not reflect a returning service member's actual financial condition and need for Chapter 7 relief. Finally, nothing in the legislative history supports the Debtors' interpretation that the exemption exists to assist wealthy veterans with pre-bankruptcy planning; in fact, the GAO mandate suggests that Congress was concerned that the exemption not be subject to abuse.

**B. The totality of the circumstances of the Debtors' financial situation demonstrates abuse.**

Almost ten years ago, this Court examined the "totality of circumstances" test in *In re Nockerts*, 357 B.R. 497 (Bankr. E.D. Wis. 2006). In that case, the U.S. Trustee moved to dismiss the debtors' case under the means test of § 707(b)(1) and totality of the circumstances test of § 707(b)(3). The U.S. Trustee argued that the debtors failed the means test because they took a deduction for a mortgage that they did not intend to reaffirm. At the time of the petition, the debtors were liable for the mortgage debt, and the issue turned on whether the debt was

9

"scheduled as contractually due" to qualify for deduction under § 707(b)(2)(A)(iii). After examining the cases on both sides of the issue, the Court held that the debtors' mortgage was scheduled as contractually due on the petition date, and the mortgage payment could be deducted. *Id.* at 505.

In *Nockerts*, the U.S. Trustee argued in the alternative that if the mortgage payments were found to be deductible and the debtors passed the means test, the case should be dismissed under the totality of the circumstances because the debtors would have the ability to use the mortgage payments to pay their creditors under a Chapter 13 plan. In analyzing this argument, the Court examined the substantial abuse test in effect prior to BAPCPA and noted that some Circuits applied a *per se* rule under which the debtor's ability to pay his debts, standing alone, justified dismissal as a substantial abuse of Chapter 7. *Id.* The Court found significant that BAPCPA adopted the Fourth Circuit's "totality of the circumstances test" by name, and that test includes a consideration of more than simply the ability to pay. *Id.* at 506 (citing *Green v. Staples (In re Green)*, 934 F.2d 568, 572 (4th Cir. 1991)). In *Green*, in addition to the debtor's ability to fund a Chapter 13 plan, the court of appeals listed the following non-exclusive factors:

(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

(3) Whether the debtor's proposed family budget is excessive or unreasonable;

(4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

(5) Whether the petition was filed in good faith.

*Id.* The court of appeals in *Green* stated that "exploring these factors, as well as the relation of the debtor's future income to his future necessary expenses, allows the court to determine more

10

accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors." *Id.*

In *Nockerts*, the Court held that more than the ability to pay evidenced by the debtors' lack of a $2,800 mortgage payment was needed for the U.S. Trustee to sustain his burden of proof. *Nockerts,* 357 B.R. at 507. Accordingly, the Court scheduled an evidentiary hearing to enable the parties to present evidence of the totality of the debtors' financial situation, which could have included evidence of the rent and other expenses the debtors would incur in lieu of the mortgage payments and the reasonableness (or lack thereof) of their other expenses.

In this case, the U.S. Trustee cites the Debtors' stable income, ability to reduce excess expenses, and deductions that no longer apply as factors suggesting that the case should be dismissed under the totality of the circumstances. The Debtors counter that all of these examples boil down to a single consideration -- whether the Debtors have the ability to repay their creditors, and that the ability to repay their creditors is not enough to warrant dismissal. The Debtors rely on the Court's comment in *Nockerts* that more than an ability to pay should be shown.

The U.S. Trustee's position echoes the *Green* factors, while the Debtors' argument construes the statute and the Court's decision in *Nockerts* too narrowly.[3] First, the Debtors'

---

[3] In *Nockerts*, the Court recognized that ability to pay is a factor in the totality of circumstances test in below-median income cases in which the means test does not apply: "Moreover, the cases that have granted § 707(b)(3) 'totality of the circumstances' motions based on a debtor's ability to pay are distinguishable from this one. *In re Paret*, 347 B.R. 12 (Bankr. D. Del. 2006), *In re Pennington*, 348 B.R. 647 (Bankr. D. Del. 2006), and *In re Pak*, 343 B.R. 239 (Bankr. N.D. Cal. 2006), all involved below-median income debtors. Accordingly, the courts in those cases, limited by § 707(b)(7), were prohibited from subjecting those debtors to the means test under § 707(b)(2). Since no means test was performed, an inquiry into the debtors' ability to pay was rightly conducted, for the first time." *Nockerts*, 357 B.R. at 507 (emphasis in original). The Court continues to recognize that § 707(b)(3) rightly includes an ability to pay analysis in certain situations.

11

gross annual income $591,867 suggests wealth; for the same period, the median income in the State of Wisconsin for a family of three was $68,801. (ECF No. 27-1.) The Debtors' income is based on stable, steady employment that is likely to continue into the foreseeable future. Moreover, nothing about the Debtors' budget gives any indication that the Debtors are willing to tighten their belts and live frugally in order to demonstrate financial circumstances that are deserving of Chapter 7 relief. The Debtors claim $2,430 per month in entertainment expenses alone, including waterpark stays and trips to South Africa. Their food, home maintenance, grooming, clothing and vehicle payments are all outrageously excessive. Thomas has two vehicles with payments totaling $1,250. Even with her excessive expenses, Natasha still budgets $500 each month for "incidentals". In the face of these lavish expenditures, the Debtors' schedules still show a surplus of $3,732 every month, even without deducting significant expenses they no longer incur. Assuming the Debtors arguably could maintain their deduction for the $1,152 in mortgage payments that were contractually due when they filed their petition, there is no basis to continue a $5,500 attorney fee deduction that ended with the divorce decree. Granting them some allowance for attorneys' fees that might be incurred going forward, the Debtors have an excess of $9,000 in income over expenses each and every month, further suggesting that they neither need nor deserve the protections and relief afforded by Chapter 7. *See In re Schwartz*, 532 B.R. 710, 716 (Bankr. N.D. Ill. 2015) (citations omitted) ("[B]ankruptcy protection was not intended to assist those who are attempting to preserve a comfortable standard of living at the expense of their creditors."), *aff'd*, No. 15-1416, 2015 U.S. App. LEXIS 14846 (7th Cir. Aug. 24, 2015).

In the light of all these circumstances suggesting their utter lack of qualification, the Debtors have not articulated any medical condition, job insecurity, inability to fund a Chapter 13

plan or other factor that demonstrates that they need Chapter 7 relief, relying instead on their misplaced notion that the Act embodies a policy to grant Chapter 7 discharges to even the wealthiest veterans. The Debtors' policy argument fails: Congress only meant to relieve returning service members who might not qualify for Chapter 7 relief from the presumption and machinations of the means test. It did not envision that veterans whose <u>surplus</u> of income over expenses exceeded the state's median income would be eligible for Chapter 7 relief. While respectful of the service that Thomas provided in the military, the Court can barely imagine a case in which the totality of the debtors' financial circumstances would be more abusive of Chapter 7 than this one.

### III. Conclusion

In summary, the U.S. Trustee is correct that the "totality of the circumstances test" applies in this case, even though the Debtors are exempt from any form of means testing. And the U.S. Trustee has met his burden of showing that the totality of the circumstances strongly suggests abuse in this case. The Debtors are not needy. They live lavishly with expenses that are unreasonable for a Chapter 7 debtor. They have offered no reason – such as a sudden illness or calamity – justifying that they qualify for Chapter 7 relief. The Court will enter a separate Order granting the U.S. Trustee's Motion to Dismiss.

Dated: September 3, 2015

By the Court:

*Susan Kelley*
Susan V. Kelley
Chief U.S. Bankruptcy Judge